<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARCO GUINTA,<br><br>                    Plaintiff,<br><br>v.<br><br>ACCENTURE, LLP,<br><br>               Defendant. | Civ. No. 08-3376 (DRD)<br><br><br>**O P I N I O N** |

*Appearances by:*

SOKOL, BEHOT AND FIORENZO
by: Susan Burns, Esq.
433 Hackensack Avenue
Hackensack, NJ 07601

     *Attorneys for Plaintiff*

WONG FLEMING, P.C.
by: Linda Wong, Esq.
621 Alexander Road, Suite 150
Princeton, NJ 08543

     *Attorneys for Defendant*

<u>**DEBEVOISE, Senior District Judge**</u>

     Plaintiff Marco Guinta is a former employee of Defendant Accenture, LLP ("Accenture").

Following the termination of his employment on March 12, 2008, Mr. Guinta filed identical

complaints in the Superior Courts of New Jersey for Bergen and Morris Counties alleging that

his firing violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and

the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et. seq.  In addition to

the discrimination claims, the Complaint seeks payment of various benefits allegedly withheld by

Accenture.  Accenture removed on the grounds this court has jurisdiction pursuant to 28 U.S.C. §

1331.  In the alternative, Accenture argues that this court properly has jurisdiction based on

diversity of citizenship under 28 U.S.C. § 1332.

Accenture now moves to dismiss Counts Three through Seven of Mr. Guinta's Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief

can be granted.  For the reasons set forth below, that motion will be treated as a request for

summary judgment, granted in part, and denied in part.

## I.  BACKGROUND

Mr. Guinta has a shattered voicebox which affects his ability to speak.  That disability

does not appear to have limited Mr. Guinta's capacity to perform his duties at Accenture, where

he was employed from June 17, 2002 until his termination on March 12, 2008.  Indeed, Mr.

Guinta's employee evaluations consistently rated his performance as "above average."

(Compl. ¶ 10.)  Accenture acknowledges that Mr. Guinta was not fired due to misconduct or poor

work performance, but rather as part of a routine "position elimination."  (Def.'s Br. Supp. Mot.

Dismiss. 3.)

At the time of his termination, Mr. Guinta's base compensation was $230,000 per year.

In addition to his salary, Mr. Guinta was eligible for Paid Time Off ("PTO") and performance-

based bonuses.  Mr. Guinta's 2007 and 2008 Compensation Models provided that he would

receive an "annual incentive" cash bonus and "long term incentive" equity bonus, each equal to

2

his base pay, if he met his yearly target of $40 million in sales.  (Compl., Ex. A, B.)  The terms of the latter bonus provided that it would be paid at the completion of the fiscal year in the form of equity, but did not specify the form of stock which would be awarded or provide a vesting schedule for the securities.  (Compl., Ex. A, B.)

Mr. Guinta's Complaint, which was filed in the Superior Court of New Jersey on June 26, 2008 and subsequently removed to this court, contains seven Counts.  The first two claim, respectively, that Accenture terminated Mr. Guinta in violation of the NJLAD and the ADA.  Those allegations are not at issue in the motion currently before the court, which contends that Counts Three through Seven should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Counts Three through Seven allege that Accenture wrongfully refused to pay Mr. Guinta various benefits after his termination on March 12, 2008.  Specifically, Mr Guinta claims that his 2007 and 2008 Compensation Models, along with the terms of Accenture's Separation Benefits Plan, entitle him to (1) separation benefits of 13 weeks pay plus four months of COBRA payments, (2) payment for 340 hours of PTO, (3) a 2007 long term incentive equity bonus of $230,000 in Accenture stock, and (4) both cash and equity bonuses for the period between the end of the 2007 fiscal year and the termination of his employment.  In response, Accenture argues that (1) Mr. Guinta's refusal to execute a Separation Agreement made him ineligible for severance pay, (2) the company's PTO policy clearly specified that only 240 hours would be paid out after an employee's dismissal, (3) Mr. Guinta's 2007 long term incentive equity bonus had not vested at the time of his termination, and (4) Mr. Guinta's claim for cash and equity bonuses accrued between the end of 2007 and his termination is speculative and Mr. Guinta was not

entitled to any bonuses for the 2008 year.  In support of their arguments, the parties point to various contracts and employment documents.

Both parties agree that the terms of Accenture's Separation Benefits Plan ("the Plan") govern Count Three's claim for severance payments.  The Plan's summary, which is relied on by both parties as a statement of the relevant terms, provides that:

> If your employment with Accenture is terminated as part of a Workforce Reduction or Position Elimination, you submit a signed Separation Agreement to Accenture by the specified deadline (and, if applicable, do not revoke the Agreement), and you satisfy all the other conditions of the Plan, you will be entitled to Separation Benefits.[1]

(Compl. Ex. C.) In a section entitled "Separation Agreement," the Plan makes it clear that "[a] Participant whose employment is terminated for Workforce Reduction or Position Elimination is eligible for Separation Benefits only if the Participant signs and submits to Accenture a Separation Agreement in the written form provided and approved by Accenture."  (Id. (emphasis in original).)  Finally, the Plan specifies that it is "governed and shall be construed in accordance with ERISA," the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., enumerates the various rights granted to employees under that law, and names Accenture as the fiduciary responsible for Plan administration.  (Id.)

The Separation Agreement required by the Plan states that "Accenture is offering you the opportunity to receive Separation Benefits in exchange for signing a general release of claims."  (Def.'s Br. Supp. Mot. Dismiss, Ex. A.)  That release is extremely broad, and includes "any and

---

[1] The "separation benefits" for an employee of Mr. Guinta's position and experience consist of 13 weeks salary and 4 months of COBRA payments.  (Compl., Ex. C.)

all claims of any nature whatsoever, known or unknown," such as "[c]laims for the payment of

any salary, wages, bonuses and commissions," and "[c]laims of discrimination under the

common law or any federal or state statute (including ... the Americans with Disabilities Act)."

(Id.)  Mr. Guinta did not execute the Separation Agreement.  (Pl.'s Br. Opp'n Mot. Dismiss 17.);

(Def.'s Br. Supp. Mot. Dismiss 6.)

Accenture introduces two documents in support of its argument that Count Four should

be dismissed.  The first, entitled "United States Policy: Paid Time Off," states that "unused PTO

balances (up to 240 hours) will be paid out upon separation from the Company or prior to going

on an approved unpaid leave of absence.  Any unused accrued balance in excess of 240 hours

will not paid out, except where required by local law."  (Def.'s Br. Supp. Mot. Dismiss, Ex. D.)

The second document is a list of "Separation Package Frequently Asked Questions for

Employees," which reiterates that "PTO will be paid out only up to 240 hours, except in states

where law requires otherwise."  (Def.'s Br. Supp. Mot. Dismiss, Ex. C.)

In support of the claim contained in Count Five, that Accenture wrongfully refused to pay

his equity bonus for 2007, Mr. Guinta refers the court to his 2007 Compensation Model.  That

document states Mr. Guinta's yearly sales "target" for 2007 as $40 million, and Accenture

concedes that Mr. Guinta met his sales target for the 2007 fiscal year.  (Def.'s Br. Supp. Mot.

Dismiss 2.)  In reference to the equity bonus, the Compensation Model provides that "you will ...

be eligible for a Long Term Incentive award program aligned to your target - this award is paid at

the completion of the fiscal year in the form of equity."  (Compl., Ex. A.)  The Compensation

Model also states that "the Long Term Incentive Award percentages for FY07 at the various

performance levels are as follows: ... Target - 100% of your base pay as a bonus payable in

equity," thus fixing the value of Mr. Guinta's 2007 equity bonus at $230,000.  (Id.)  Finally, the

Model provides that its terms are the sole authority governing compensation by stating that:

> This model supersedes any type of other variable pay program or
> equity program in which you may currently be participating...  As a
> result, you will not be eligible for any other type of company wide
> or local variable pay programs or equity programs.  Please be
> advised that Accenture reserves the right to amend, modify, or
> withdraw this model at any time, with or without notice.

(Compl., Ex. A.)

Mr. Guinta agreed to the 2007 Compensation Model on August 20th of that year.  Neither party

contends that the 2007 Compensation Model was modified or abrogated prior to its expiration.

Accenture contends that the equity award provided for by the Compensation Model was

subject to the terms of a separate document, the "Form of Employee Restricted Share Unit

Agreement (Fiscal 2008)" ("RSU Agreement").  That Agreement incorporates by reference two

others: the "Accenture Ltd. 2001 Share Incentive Plan" ("SIP") and the "Senior Manager

Restricted Share Unit Agreement Essential Grant Terms" ("Essential Grant Terms").  Thus,

Accenture claims that Mr. Guinta's equity bonus was subject to the terms and conditions of all

three documents.

The RSU Agreement, which defines an RSU as "the unfunded, unsecured right of the

Participant to receive a Share on the date(s) specified herein, subject to the conditions specified

herein," includes a heading titled "Vesting Schedule."  (Def.'s Br. Supp. Mot. Dismiss, Ex. G.)

The schedule states that:

> Subject to the Participant's continued employment with the Company
> ... the RSUs shall vest pursuant to the vesting schedule set forth in the
> Essential Grant Terms (as modified by this Agreement), until such
> RSUs are 100% vested.   Upon the Participant's termination of

employment for any reason, any unvested RSUs shall immediately terminate, and no other shares shall be issued.

(Id.)

The Agreement also contains a section under which the Participant acknowledges that:

> Participant's participation in the Plan is outside the terms of the Participant's contract of employment with the Constituent Companies and is therefore not to be considered part of any normal or expected compensation and that the termination of the Participant's employment under any circumstances whatsoever will give the Participant no claim or right of action against the Company or its Affiliates in respect of any loss of rights under this Agreement or the Plan.

(Id.)

Finally, the RSU Agreement states that its "interpretation, performance and enforcement" shall be "governed by the laws of the State of New York ... and shall be subject to the exclusive jurisdiction of the New York Courts."  (Id.)

The SIP contains information on the pricing and administration for stock option and RSU grants on the part of Accenture.  (Def.'s Br. Supp. Mot. Dismiss, Ex. H.)  The details of those terms are largely irrelevant for the purposes of this ruling, except inasmuch as the SIP provides that "[t]he Plan shall be governed by and construed in accordance with the laws of the State of New York."  (Id.)

The Essential Grant Terms lay out the specifics of the vesting schedule provided for in the RSU Agreement.  That document provides that the shares awarded under the RSU Agreement will vest over a period of three years, with one third vesting each year.  (Def.'s Br. Supp. Mot. Dismiss, Ex. J.)  Thus, Accenture claims that under the RSU Agreement and Essential Grant Terms, none of the shares awarded at the end of 2007 as part of Mr. Guinta's equity bonus for

7

that year could have vested by the time he was terminated roughly three months later on March

12, 2008.  Since the RSU Agreement provides that unvested shares are forfeited in the event of

termination, Accenture argues that Mr. Guinta is barred from asserting the claim for those shares

contained in Count Five of the Complaint.

## II.  DISCUSSION

As a preliminary matter, it is necessary to address the nature of the motion currently

before the court.  In support of its contention that Counts Three through Seven of Mr. Guinta's

Complaint do not state a claim upon which relief can be granted, Accenture introduces various

documents that allegedly preclude those claims.  The inclusion of those documents, many of

which were not part of the pleadings and were not relied upon by the Complaint, requires this

court to treat Accenture's motion as a request for summary judgment.  Fed. R. Civ. P. 12(d).

Accenture rightly points out that "a court may consider an undisputedly authentic

document that a defendant attaches as an exhibit to a motion to dismiss" without converting the

motion to one for summary judgment.  Pension Benefit Guar. Corp. v. White Consol. Indus.,

Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  However, the court may only do so "if the plaintiff's

claims are based on the document."  Id.

Accenture seeks to introduce three documents that were not relied upon by the

Complaint.  While Accenture's argument with regard to Count Three is based on the terms of the

Separation Benefits Plan, a document that was cited in the Complaint and attached thereto, the

company refers to documents outside the pleadings in support of its contention that Counts Four

through Seven should be dismissed.  Specifically, Accenture alleges that the company's PTO

Policy (Def.'s Br. Supp. Mot. Dismiss, Ex. D) is dispositive as to Count Four of the Complaint,

and that the RSU Agreement (Def.'s Br. Supp. Summ. J. Ex. G) and RSU Agreement Essential

Grant Terms (Def.'s Br. Supp. Mot. Dismiss, Ex. J) require dismissal of Counts Five through

Seven.  Mr. Guinta does not dispute the authenticity of the documents that accompany

Accenture's motion, but argues as a matter of law that he is not bound by their terms.

 Since the documents Accenture seeks to introduce are outside the scope of the pleadings

and did not form the basis of Mr. Guinta's claims, the motion to dismiss will be converted to a

motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 12(d); <u>Pension Benefit Guar. Corp.</u>, 998 F.2d

at 1196.  When converting a motion to dismiss to one for summary judgment, a court must

normally give the litigants 10 days notice to oppose the motion pursuant to the requirements

Federal Rule of Civil Procedure 56(c).  <u>Pension Benefit Guar. Corp.</u>, 998 F.2d at 1196.  The

purpose of that notice is to allow the parties time to "research and present the law, as well as an

opportunity to marshal the facts." <u>Hancock Indus. v. Schaeffer</u>, 811 F.2d 225, 229 n.1 (3d Cir.

1987).

 On September 30, 2008, the court informed both parties that the motion would be treated

as a request for summary judgment.  In order to give the parties a fair opportunity to file

arguments based on the standard of review applicable to such requests, the court adjourned for

four weeks.  During that time, Mr. Guinta submitted a brief in opposition to Accenture's original

motion, and Accenture filed reply brief in support of summary judgment.

**A.  Summary Judgment Standard of Review**

 Summary judgment is proper where "there is no genuine issue as to any material fact and

. . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an

issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury

could find for the non-moving party." <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir.

2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under

governing law." <u>Id.</u> Disputes over irrelevant or unnecessary facts will not preclude a grant of

summary judgment.

      The party moving for summary judgment has the burden of showing that no genuine issue

of material fact exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). When the moving

party does not bear the burden of proof at trial, the moving party may discharge its burden by

showing that there is an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325.

If the moving party can make such a showing, then the burden shifts to the non-moving party to

present evidence that a genuine fact issue exists and a trial is necessary. <u>Id.</u> at 324. In meeting

its burden, the non-moving party must offer specific facts that establish a material dispute, not

simply create "some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.,</u>

<u>Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

      In deciding whether an issue of material fact exists, the Court must consider all facts and

their reasonable inferences in the light most favorable to the non-moving party. <u>See</u> <u>Pa. Coal</u>

<u>Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to

weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a

genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). If there are

no issues that require a trial, then judgment as a matter of law is appropriate. <u>Id.</u> at 251-52.

**B. Count Three: Severance Pay**

      Count Three of the Complaint alleges that Accenture wrongfully withheld separation

benefits to which Mr. Guinta was entitled as a result of his termination. Accenture counters that

those benefits were contingent on Mr. Guinta's agreement to waive future claims against the company. Because Mr. Guinta did not agree to waive those claims, Accenture contends that it was under no obligation to pay severance benefits.

It is well-established that an employee is not automatically entitled to severance benefits in the absence of an employer policy or contract providing for such payments. See, e.g. Local Union No. 1992 of the Int'l Bhd. Of Elec. Workers v. The Okonite Co., 189 F.3d 339, 340 (3d Cir. 1999) (stating that employees' claim for entitlement to severance benefits arose out of collective bargaining agreement); Deibler v. United Food and Commercial Local Workers' Union 23, 973 F.2d 206, 210 (3d Cir. 1992) (stating that the plaintiff in that case had "no right to severance benefits" because the severance pay plan at issue was revoked prior to his termination). As a condition of receiving severance benefits, an employee may be required by the relevant policy or contract to waive claims against his or her employer that arose prior to termination. See Local Union No. 1992, 189 F.3d 339 at 344-45 (reversing district court's holding that severance benefits agreement did not require former employees of an electrical component manufacturer to waive all claims, and remanding for determination of whether the terms of the agreement required such a release); Mullen v. N.J. Steel Corp., 733 F. Supp. 1534, 1543-44 (D.N.J. 1990) (holding that plaintiff's knowing and voluntary release of "all claims past and present" in exchange for severance benefits was an effective waiver of a cause of action arising under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et. seq.). In cases where such a waiver is required, an employee's refusal to sign the release agreement will render that employee ineligible for severance benefits. Hooven v. Exxon Mobil Corp., 465 F.3d 566, 575 (3d Cir. 2006).

11

The parties agree that the terms and amount of Mr. Guinta's severance benefits were governed by Accenture's Separation Benefits Plan ("the Plan").  The Plan provided that an employee of Mr. Guinta's rank should receive 13 weeks pay and four months of COBRA payments in the event of termination due to position elimination.  (Compl. Ex. C.)  However, the Plan explicitly stated that "[a] Participant whose employment is terminated for Workforce Reduction or Position Elimination is eligible for Separation Benefits <u>only if</u> the Participant signs and submits to Accenture a Separation Agreement in the written form provided and approved by Accenture ... within the deadline specified in the Separation Agreement."  (<u>Id.</u> (emphasis in original).)  Section Two of that Agreement, entitled "General Release of Claims," stated that Mr. Guinta released Accenture from "all claims of any nature whatsoever," including future claims for "salary, wages, bonuses and commissions."  (Def.'s Br. Supp. Mot. Dismiss, Ex. C.)  Thus, Mr. Guinta's eligbility for severance was expressly conditioned on his consent not to seek any other form of payment.

Mr. Guinta concedes that he did not sign the Separation Agreement.  (Pl.'s Br. Opp'n Mot. Dismiss 17.)  Since the Plan expressly conditioned eligibility for the salary and COBRA payments which he seeks on his acquiescence to such an Agreement, Mr. Guinta's claim that he is entitled to those benefits is meritless.  See Hoover, 465 F.3d at 575.  Therefore, the court will grant summary judgment in favor of Accenture on Count Three of the Complaint.[2]

## C.  Count Four: Accrued "Paid Time Off" Hours

Count Four of the Complaint alleges that Accenture wrongfully denied PTO benefits to

---

[2] The court would reach the same result even if Mr. Guinta had signed the Agreement, as his assertion of claims for PTO and bonuses would constitute a material breach of waiver contained in Section Two of that document.  See (Def.'s Br. Supp. Mot. Dismiss, Ex. A.)

which Mr. Guinta was entitled as a result of his termination.  Specifically, the Complaint alleges

that Mr. Guinta had accrued 340 hours of PTO at the time of his termination, and that he was not

paid for those hours.  (Compl. ¶¶ 44-46.)  Accenture argues that Mr. Guinta was only entitled to

240 hours of PTO, and alleges that it already rendered payment for those hours.  (Def.'s Br.

Supp. Mot. Dismiss 10-11.); (Def.'s Reply Br. Supp. Summ. J. 15.)

      In support of its claim that Mr. Guinta's PTO benefits must be limited to 240 hours,

Accenture introduces two documents.  The first, which is entitled "United States Policy: Paid

Time Off," states that "unused PTO balances (up to 240 hours) will be paid out upon separation

from the Company or prior to going on an approved unpaid leave of absence.  Any unused

accrued balance in excess of 240 hours will not be paid out, except where required by local law."

(Def.'s Br. Supp. Mot. Dismiss, Ex. D.)  The second document is a list of "Separation Package

Frequently Asked Questions for Employees," which reiterates that "PTO will be paid out only up

to 240 hours, except in states where law requires otherwise."  (Def.'s Br. Supp. Mot. Dismiss,

Ex. C.)

      Mr. Guinta does not dispute the authenticity of those documents, but argues that he was

unaware of the policy.  That argument is unavailing.  Mr. Guinta's claim for unused PTO hours

does not arise out of any statute or case law, but rather out of Accenture's PTO policies

themselves, which form an "employee welfare benefit plan" governed by ERISA.  See 29 U.S.C.

§ 1002(1) (defining "employee welfare benefit plan" to include "any plan fund or program ...

established or maintained by an employer ... for the purpose of providing its participants ...

benefits in the event of sickness or ... vacation benefits.")  Having asserted a claim for benefits

pursuant to those policies, Mr. Guinta may not argue that his ignorance of their specifics justifies

a circumvention of their terms.  See In re Lucent Death Benefits ERISA Litig., 541 F.3d 250,

254-55 (3d Cir. 2008) (An employer's obligations under a benefit plan are governed by the

"written documents and summary plan descriptions" relating to that plan, and such documents

should be interpreted "as a matter of law without looking to extrinsic evidence" when their

meaning is "clear and unambiguous.").  Therefore, the claim for PTO will be reduced to 240

hours.

Accenture contends in its reply brief that the company paid Mr. Guinta 240 hours of PTO

after he was terminated.  (Def.'s Reply Br. Supp. Summ. J. 15.)  In support of that claim, the

company submits an "Electronic Earnings Statement" which indicates that Mr. Guinta was paid

for 240 hours of PTO on April 7, 2008.  (Def.'s Reply Br. Supp. Mot. Dismiss, Ex. A.)  Mr.

Guinta has not disputed the authenticity of that document, despite having ample opportunity to

do so in either his subsequent filings or oral arguments.  Therefore, the court will accept the

Electronic Earnings Statement as proof that Mr. Guinta was paid the 240 hours of PTO to which

he was entitled, and grant summary judgment in favor of Accenture on Count Four of the

Complaint.

**D.  Count Five: Equity Bonus for 2007**

Count Five of the Complaint alleges that Accenture wrongfully refused to pay Mr.

Guinta's 2007 "long term incentive" bonus.  The 2007 Compensation Model provided for such a

bonus, to be paid "at the completion of the fiscal year in the form of equity" equivalent to Mr.

Guinta's base pay of $230,000, if he reached his annual sales target of $40 million.

(Compl., Ex. A.)  Accenture concedes that Mr. Guinta met his sales target of $40 million for the

2007 fiscal year, but argues that the equity shares that made up the bonus were subject to a three-

year vesting schedule contained in two documents which are not referenced or incorporated by the Compensation Model, the RSU Agreement and RSU Agreement Essential Grant Terms. (Def.'s Br. Supp. Mot. Dismiss 2.)  Mr. Guinta did not sign either of those documents, and argues as a matter of law that he is not bound by their terms.  (Pl.'s Br. Opp'n Mot. Dismiss 13-14.)

"[C]ontract construction – the determination of the legal relations of the parties to the contract – is a question of law."  TracindaCorp. v. DaimlerChrysler AG, 503 F.2d 212, 229 (3d. Cir. 2007) (internal citations and quotations omitted).  Therefore, a ruling interpreting the terms of a contract, or the issue of whether it binds a given party, forms an appropriate ground for summary judgment on claims arising out of that contract.  See Anderson, 477 U.S. 242, 251 (summary judgment is appropriate "if, under the governing law, there can be but one reasonable conclusion as to the verdict.").

Contracts should be construed according to the plain and ordinary meaning of their terms. See, e.g. Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492 (1932); Imperial Life Ins. Co. v. Coos County, 151 U.S. 452, 463 (1894); J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract."  Bohler-Uddeholm, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotations and citations omitted).  Thus, the court must give force to the intent of the parties by interpreting any agreement between Mr. Guinta and Accenture according to the plain usage of its terms.  See Gleason v. Nw. Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

When determining the rights and duties granted by an agreement, "[i]t goes without

saying that a contract cannot bind a nonparty." E.E.O.C. v. Waffle House, 534 U.S. 279, 294 (2002); Hay Group v. E.B.S. Acquisition Group, 360 F.3d 404, 406 (3d Cir. 2004) ("parties to a contract cannot bind nonparties."). Mr. Guinta agreed to the Compensation Model, but never signed the RSU Agreement or otherwise indicated that he agreed to be bound by its terms. Therefore, the vesting schedule contained in the RSU Agreement and the RSU Essential Grant Terms applied to Mr. Guinta's equity grant only if the plain meaning of the terms of the Compensation Model demonstrates that he agreed to that schedule.

On examination of the Compensation Model, the court finds no evidence that the equity grant was subject to the vesting schedule contained in the RSU Agreement. Quite the opposite; the Compensation Model clearly states that "the award is to be paid at the completion of the fiscal year," and explicitly disavows the incorporation of terms from any other payment plan by declaring that "[t]his model supersedes any type of other variable pay program or equity program in which you may currently be participating." (Compl., Ex. A.)

The unambiguous language of the RSU Agreement lends further support to the conclusion that the vesting schedule and other terms contained therein did not apply to the Compensation Model. The RSU Agreement clearly states that awards granted under its auspices are "outside the terms of the Participant's contract of employment with the Constituent Companies and [are] therefore not to be considered part of any normal or expected compensation." (Def.'s Br. Supp. Mot. Dismiss, Ex. G.) Indeed, the terms of the RSU Agreement applied only to the 2008 fiscal year, and therefore could not possibly have been incorporated by the 2007 Compensation Model. See (Id.)

Based on the fact that Mr. Guinta was not a party to the RSU Agreement and the terms of

16

that document were not incorporated by the 2007 Compensation Model, the court finds that the

2007 equity bonus was not subject to a vesting schedule and became due in full at the end of that

fiscal year.  As the drafter of the Compensation Model, Accenture could easily have incorporated

a vesting schedule similar to the one contained in the RSU Agreement.  See Mastrobuono v.

Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995) (when interpreting the terms of a contract,

"a court should construe ambiguous language against the interest of the party that drafted it.").

Having failed to do so, it may not point to that schedule as justification for denying Mr. Guinta

the equity bonus to which he was entitled under the Compensation Plan.  Therefore, the court

will deny Accenture's request for summary judgment on Count Five of the Complaint.

**E.  Counts Six and Seven: Cash and Equity Bonuses for Fiscal Year 2008**

Counts Six and Seven of the Complaint contend that Accenture wrongfully refused to pay

Mr. Guinta's  "annual incentive" cash bonus and "long term incentive" equity bonus for the

period between the end of the 2007 fiscal year and his termination on March 12, 2008.  Those

Counts assert, respectively, that (1) Accenture violated the covenant of good faith and fair

dealing implied in the 2008 Compensation Plan, and (2) was unjustly enriched as a result of work

performed by Mr. Guinta between the end of the 2007 fiscal year and his termination.  In

opposition to those allegations, Accenture sets forth a counter-argument to the equity bonus

claim, but does not address the allegations that it wrongfully withheld the "annual incentive"

cash bonus.  Accenture contends that (1) the claims in Count Six and Seven arise out of the RSU

Agreement, which states that New York law governs its terms, and (2) under New York law, the

facts alleged are not sufficient to state a claim for violation of the implied covenant of good faith

and fair dealing or unjust enrichment.

17

Having already decided with reference to Count Five that the terms of the RSU Agreement are not incorporated by the 2007 Compensation Model, the court holds that the nearly-identical terms of the 2008 Model render the RSU Agreement similarly irrelevant to the claims asserted in Counts Six and Seven. Furthermore, since the 2008 Compensation Plan includes specific provisions that govern the claims asserted in Counts Six and Seven, there is no need to delve into the intricacies of case law on claims for breach of the implied covenant of good faith and fair dealing or unjust enrichment. Summary judgment will be denied on the portion of Counts Six and Seven relating to the annual incentive cash bonus, but will be granted on the portions of those Counts relating to the long term incentive equity bonus.

### i. *Annual Incentive – Cash Bonus*

The 2008 Compensation Model clearly states that "employees who are terminated by Accenture (other than 'for cause') before the end of the quarter in which an Annual Incentive award is earned are entitled to receive the award earned in that quarter." (Compl., Ex. B.) To be eligible for that bonus, Mr. Guinta was required to achieve a minimum of 75 percent of his yearly sales target of $40 million. (Id.) When pro rated over the four quarters of a fiscal year, Mr. Guinta's sales target was $10 million per quarter. Therefore, Mr. Guinta was entitled to an annual incentive cash bonus for the first quarter of 2008 if he achieved sales of at least $7.5 million. The Compensation Model provided that, after the threshold was reached, the amount of the annual incentive award should be calculated by multiplying the percentage of Mr. Guinta's sales target achieved by his salary, which was $57,500 per quarter. (Compl., Ex. B.)

Mr. Guinta alleges that "the business [he] had generated and/or was in the process of generating would have resulted in his achievement of his target sales by the end of the year

2008," but has not presented evidence relating to the specific percentage of his sales target achieved.  See (Compl. ¶ 60.)  Without that information, the court is unable to calculate the proper annual incentive award.  Therefore, summary judgment on the portion of Counts Six and Seven relating to the annual incentive cash bonus will be denied in order to allow the parties to undertake discovery and present evidence on the factual question of whether Mr. Guinta met his sales target between the end of 2007 and his termination.

### ii.  Long Term Incentive – Equity Bonus

The 2008 Compensation Model states with respect to the long term equity bonus that "this award, if you qualify, will be granted following the completion of the fiscal year."  (Compl., Ex. B.)  By enumerating the specific time at which the bonus was to be granted, the 2008 Compensation Model precludes any earlier award and conditions eligibility on continued employment at the end of the fiscal year.  Therefore, the court will grant summary judgment in favor of Accenture on the portion of Counts Six and Seven relating to the long term incentive equity bonus.

The court's conclusion – that the terms of the 2008 Compensation Model prohibit payment of an equity bonus on the basis of work performed during a period shorter than the complete year – draws further support from an examination of the contract as a whole.  Nothing in the Compensation Model provides for such payments, and a critical difference between the 2007 and 2008 versions of that document militates against such an interpretation.  The 2007 Compensation Model provided that "employees who are terminated by Accenture (other than 'for cause') before the end of the quarter in which a bonus is earned are entitled to receive the bonus earned in that quarter."  (Compl., Ex. A.)  The 2008 Compensation Model replaced the broad

19

term "bonus" – which would have applied to both the annual incentive cash award and the long term incentive equity grant – with the words "annual incentive award," thereby limiting bonus eligibility for employees terminated before the end of the fiscal year to cash awards.  <u>See</u> (Compl., Ex. B.)  An interpretation which allowed individuals, such as Mr. Guinta, terminated prior to the end of the year to receive an equity bonus would negate that change and thus violate the parties' intent (as shown by the modification) to preclude such awards.

## III.  CONCLUSION

For the reasons set forth above, Accenture's Motion for Summary Judgment is granted in part and denied in part.  The court rules as follows:

1.  Summary Judgment is granted on Count Three of the Complaint.  Count Three is dismissed.

2.  Summary Judgment is granted on Count Four of the Complaint.  Count Four is dismissed.

3.  Summary Judgment is denied on Count Five of the Complaint.

4.  Summary Judgment is denied on the portion of Counts Six and Seven of the Complaint relating to the annual incentive cash bonus.

5.  Summary Judgment is granted on the portion of Counts Six and Seven of the Complaint relating to the long term incentive equity bonus.  Those portions of Counts Six and Seven are dismissed.

The court will enter an order implementing this opinion.


**s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: November 6, 2008

21