<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MARCO GIUNTA, | Civ. No. 08-3776 (DRD) |
| Plaintiff, | |
| v. | **O P I N I O N** |
| ACCENTURE, LLP, | |
| Defendant. | |

*Appearances by:*

Marco Giunta
22 Overlook Drive
Riverdale, New Jersey 07457

    *Pro Se Plaintiff*

Adorno Yoss Wong Fleming, P.C.
by: Linda Wong, Esq.
821 Alexander Road, Suite 150
Princeton, New Jersey 08543

    *Attorneys for Defendant.*

<u>**DEBEVOISE, Senior District Judge**</u>

This matter comes before the Court on identical Complaints filed by Plaintiff Marco

Giunta in the Superior Courts of New Jersey for Bergen and Morris counties, alleging that his

termination of employment by Defendant Accenture, LLP ("Accenture") violated the New Jersey

Law Against Discrimination ("NJLAD") (Count One), N.J.S.A. 10:5-1, *et. seq.*, and the

Americans with Disabilities Act ("ADA") (Count Two), 42 U.S.C. § 12101 *et. seq*.  The Complaints also seek payment of various benefits allegedly withheld by Accenture, including a 2007 long-term incentive equity bonus of $230,000 in Accenture Stock (Count Five) and both cash and equity bonuses for the period between the end of the 2007 fiscal year and the date of Mr. Giunta's termination (Counts Six and Seven).[1]  Accenture removed both Complaints on the grounds that this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

Accenture now moves for summary judgment on Counts One, Two, Five, and portions of Counts Six and Seven of the Complaint.  For the reasons set forth below, the Motion will be granted in part and denied in part.  Count One will be dismissed because although Mr. Giunta established a *prima facie* case under the NJLAD, he failed to show that Accenture's company-wide restructuring was a pretext to discriminate against him.  Count Two will be dismissed because Mr. Giunta failed to establish a *prima facie* case under the ADA.  Count Five will not be dismissed because Accenture's arguments are repetitious of those that the Court explicitly rejected in its January 23, 2009 Opinion denying Accenture's Motion for Reconsideration.  Counts Six and Seven will be dismissed because Mr. Giunta rejected the terms of the 2008 Compensation Model under which he would have received his bonuses for the period between the end of the 2007 fiscal year and the date of his termination.  Furthermore, even if Mr. Giunta had accepted the terms of the 2008 Compensation Model, he has failed to provide any evidence that he met his target sales requirement to receive a bonus thereunder.

## I.  BACKGROUND

### A.     Termination and Complaint

---

[1] The Complaints also set forth claims for payment of other benefits in Counts Three and Four. As discussed below, those Counts were dismissed in the Court's November 6, 2008 Opinion.

Marco Giunta is a former employee of Accenture.  He worked there from June 17, 2002 until March 12, 2008, at which point he lost his job due to a company-wide restructuring.  Prior to his termination, Mr. Giunta held the position of Outsourcing Sales Director, helping large companies establish and maintain their computer operating platforms.  Accenture eliminated "the Outsourcing Sales position based on its desire to ship smaller, less complex sales deals to India." (Def.'s Br. Summ. J. 11.)

At the time of his termination, Mr. Giunta's base compensation was $230,000 per year. In addition, he was eligible for Paid Time Off ("PTO") and performance-based bonuses.  Mr. Giunta's 2007 and 2008 Compensation Models provided that he would receive an "annual incentive" cash bonus and "long term incentive" equity bonus, each equal to his base pay, if he met his yearly target of $40 million in sales.  (Def.'s Br. Summ. J, Ex. O, MM.)  The terms of the equity bonus indicated that it would be paid at the completion of the fiscal year, but did not specify the form of stock that would be awarded or provide a vesting schedule for the securities. (Id.)

Mr. Giunta suffers from a cracked larynx, which causes him to speak in a raspy voice and, at times, breathe heavily.  This ailment does not appear to have limited Mr. Giunta's ability to perform well when working at Accenture.  During his six-year tenure, he received positive reviews, and was thought to "communicate effectively with other employees and the public in general."  (Def.'s Br. Summ. J. 5.)  According to Accenture, prior to this lawsuit, Mr. Giunta neither disclosed his medical condition nor made any requests for accommodations.  On the other hand, Mr. Giunta alleges that he disclosed his condition as soon as he began working at Accenture, and that it made him the butt of certain jokes at the office.  In particular, he alleges

3

that Bruce Dodd, his career counselor at Accenture, made a number of "derogatory" remarks. (Pl.'s Br. Summ. J. 5.)

On June 26, 2008, following his termination, Mr. Giunta filed identical Complaints in the Superior Courts of New Jersey for Bergen and Morris counties, alleging that his termination violated the New Jersey Law Against Discrimination ("NJLAD") (Count One), N.J.S.A. 10:5-1, *et. seq.*, and the Americans with Disabilities Act ("ADA") (Count Two), 42 U.S.C. § 12101 *et. seq.* The Complaints also sought payment of various benefits allegedly withheld by Accenture. Specifically, Mr. Giunta claimed that his 2007 and 2008 Compensation Models, along with the terms of Accenture's Separation Benefits Plan, entitled him to (1) separation benefits of thirteen weeks pay plus four months of COBRA payments (Count Three); (2) payment for 340 hours of PTO (Count Four); (3) a 2007 long-term incentive equity bonus of $230,000 in Accenture Stock (Count Five); and (4) both cash and equity bonuses for the period between the end of the 2007 fiscal year and the date of his termination (Counts Six and Seven). Accenture removed both Complaints on the grounds that this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

In support of his claim in Count Five that Accenture wrongfully refused to pay his equity bonus for 2007, Mr. Giunta referred to his 2007 Compensation Model, which states that "you will . . . be eligible for a Long Term Incentive Award program aligned to your target—this award is paid at the completion of the fiscal year." (Compl., Ex. A.) Mr. Giunta's target for 2007 was $40 million in sales. The 2007 Compensation Model also states that "the Long Term Incentive Award percentages for FY07 at the various performance levels are as follows" . . . Target— 100% of your base pay as a bonus payable in equity," thus fixing the value of Mr. Giunta's 2007

equity bonus at $230,000.  (Id.)  Finally, the Model provides that its terms are the sole authority

governing compensation by stating that:

> This model supersedes any type of other variable pay program or equity program
> in which you may currently be participating. . . As a result, you will not be
> eligible for any other type of company wide or local variable pay programs or
> equity programs.  Please be advised that Accenture reserves the right to amend,
> modify, or withdraw this model at any time, with or without notice.

(Id.)

Mr. Giunta agreed to the 2007 Compensation Model on August 20th of that year.  Neither party

contends that the 2007 Compensation Model was modified or abrogated prior to its expiration.

Accenture contended that the equity award provided for by the Compensation Model was

subject to the terms of a separate document, the "Form of Employee Restricted Share Unit

Agreement (Fiscal 2008)" ("RSU Agreement").  The Agreement incorporates by reference two

others: the Accenture Ltd. 2001 Share Incentive Plan ("SIP") and the "Senior Manager

Restricted Share Unit Agreement Essential Grant Terms" ("Essential Grant Terms").  Thus,

Accenture claimed that Mr. Giunta's equity bonus was subject to the terms and conditions of all

three documents.

The RSU Agreement, which defines an RSU as "the unfunded, unsecured right of the

Participant to receive a Share on the date(s) specified herein, subject to the conditions specified

herein," includes a heading titled "Vesting Schedule."  The schedule states that:

> Subject to the Participant's continued employment with the Company . . . the
> RSUs shall vest pursuant to the vesting schedule set forth in the Essential Grant
> Terms (as modified by this Agreement), until such RSUs are 100% vested.  Upon
> the participant's termination of employment for any reason, any unvested RSUs
> shall immediately terminate, and no other shares shall be issued.

(Def.'s Br. Supp. Mot. Dismiss, Ex. G.)

The Agreement also contains a section under which the participant acknowledges that:

> Participant's participation in the Plan is outside the terms of the Participant's contracts of employment with the Constituent Companies and is therefore not be considered part of any normal or expected compensation and that the termination of the participant's employment under any circumstances whatsoever will give the Participant no claim or right of action against the Company or its Affiliates in respect of any loss of rights under this Agreement or the Plan.

(<u>Id.</u>)

Finally, the RSU Agreement states that its "interpretation, performance and enforcement" shall be "governed by the laws of the State of New York . . . and shall be subject to the exclusive jurisdiction of the New York Courts."  (<u>Id.</u>)

The SIP contains information on the pricing and administration of stock options and RSU grants on the part of Accenture.  (Def's Br. Supp. Mot. Dismiss, Ex. H.)  The details of those terms are largely irrelevant for the purposes of this decision, excepting the provision that "[t]he Plan shall be governed by and construed in accordance with the laws of the State of New York. (<u>Id.</u>)

The Essential Grant Terms lay out the specifics of the vesting schedule cited in the RSU Agreement.  Specifically, the shares awarded under the RSU Agreement will vest over a period of three years, with one third vesting each year.  (Def's Br. Supp. Mot. Dismiss, Ex. J.)  Thus, Accenture claims that under the RSU Agreement and Essential Grant Terms, none of the shares awarded at the end of 2007 as part of Mr. Giunta's equity bonus for that year could have vested by the time he was terminated roughly three months later on March 12, 2008.  Because the RSU Agreement states that unvested shares are forfeited in the event of termination, Accenture argues that Mr. Giunta is barred from asserting the claim for those shares contained in Count Five of the Complaint.

**B.      November 6, 2008 Opinion**

On August 12, 2008, Accenture moved for Summary Judgment[2] to dismiss Counts Three through Seven of the Complaint.  In doing so, it argued that (1) Mr. Giunta's refusal to execute a Separation Agreement made him ineligible for severance pay; (2) the company's PTO policy clearly specified that only 240 hours would be paid out after an employee's dismissal; (3) Mr. Giunta's 2007 long-term incentive equity bonus had not vested at the time of his termination; and (4) Mr. Giunta's claim for cash and equity bonuses accrued between the end of 2007 and his termination is speculative and Mr. Giunta was not entitled to any bonuses for the 2008 year.

In an opinion dated November 6, 2008, the Court (1) granted Accenture's Motion for Summary Judgment on Counts Three and Four; (2) denied summary judgment on Count Five; and (3) granted summary judgment on the portions of Counts Six and Seven relating to the long-term incentive equity bonus, but denied it on those relating to the annual incentive cash bonus. Specifically, with respect to Count Five, the Court found that the terms of the 2007 Compensation Model did not subject the 2007 long-term incentive equity bonus to any of the terms of the RSU Agreement because Mr. Giunta neither signed the RSU Agreement nor otherwise indicated that he agreed to be bound by its terms.  In addition, the Court found that the 2007 Compensation model did not otherwise incorporate the three-year vesting schedule contained in the RSU Agreement and RSU Essential Grant Terms for three reasons.  First, the 2007 Compensation Model completely disavowed the incorporation of terms from any other payment plan.  Second, it specifically stated that the 2007 long-term incentive equity bonus was to be paid at the completion of the fiscal year.  Third, the terms of the RSU agreement applied

---

[2] Accenture originally framed its Motion as a request for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court converted the Motion to a request for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) because it included documentary exhibits not relied on by the Complaint.  Both parties were given notice of the conversion and time to submit briefs that took into account the standard of review for such requests.

only to the 2008 fiscal year, and therefore could not have been incorporated by the 2007 Compensation Model.

With respect to Counts Six and Seven, having found that the terms of the RSU Agreement were not incorporated by the 2007 Compensation Model, the Court also found that that the nearly-identical terms of the 2008 Compensation Model were not subject to the terms of the RSU Agreement.  Moreover, since the 2008 Model includes specific provisions that govern the claims asserted in Counts Six and Seven, the Court found that there was no need to delve into the intricacies of case law on claims for breach of the implied covenant for good faith and fair dealing or unjust enrichment.  Instead, the Court resolved the question of whether to grant summary judgment on Counts Six and Seven based on its analysis of the terms of the 2008 Compensation Model.

The 2008 Model clearly states that "employees who are terminated by Accenture (other than 'for cause') before the end of the quarter in which an Annual Incentive award is earned are entitled to receive the award earned in that quarter."  (Compl., Ex. B.)  To be eligible for that bonus, Mr. Giunta was required to achieve a minimum of seventy-five percent of his yearly sales target of $40 million.  (Id.)  When prorated over the four quarters of a fiscal year, Mr. Giunta's sales target was $10 million per quarter.  Therefore, the Court held that Mr. Giunta was entitled to at least a minimum annual incentive cash bonus for each quarter of the 2008 fiscal year in which he achieved sales of at least $7.5 million.  Because Accenture presented no facts which would lead the Court to believe that Mr. Giunta did not meet his sales targets for the quarters of 2008 when he was employed by the company, summary judgment was denied on the portions of Counts Six and Seven relating to the annual incentive cash bonus.

In contrast to the annual incentive cash bonus, the Court found that Mr. Giunta was not entitled to a prorated equity bonus for the prorated equity bonus for the portion of 2008 when he was employed by Accenture.  The 2008 Compensation Model states with respect to long-term equity bonus that "this award, if you qualify, will be granted following the completion of the fiscal year." (Compl., Ex. B.)  By Enumerating the specific time at which the bonus was to be granted, the 2008 Compensation Model precluded any earlier award and conditioned eligibility on continued employment at the end of the fiscal year.  Therefore, the Court granted summary judgment in favor of Accenture on the portions of Counts Six and Seven relating to the long-term incentive equity bonus.

**C.     January 23, 2009 Opinion**

On November 21, 2008, Accenture moved the Court for reconsideration of its November 6, 2008 ruling on Count Five, and portions of Counts Six and Seven.  In doing so, Accenture argued that the provision in both the 2007 and 2008 Compensation Models stating that "Accenture reserves the right to amend, modify, or withdraw this model at any time, with or without notice," see (Compl., Ex. A, B.), rendered the promises contained in those documents illusory.  As a result, Accenture urged the Court to find that the Compensation Models were non-binding and therefore imposed no obligation to make any payments whatsoever to Mr. Giunta at the time of his termination.  (Def.'s Br. Supp. Mot. Reconsideration 8-10.)

Accenture also set forth two new factual allegations.  First, it claimed that Mr. Giunta accepted equity bonuses subject to the vesting schedule in the RSU agreement and Essential Grant Terms in 2005 and 2006.  Based on this prior practice, Accenture argued that an implied-in-fact contract existed based on a mutual understanding of the parties that the 2007 long-term equity bonus at issue in Count Five was also subject to the three-year vesting schedule, such that

one third of the bonus would vest each year after it was granted.  Accenture argued that because Mr. Giunta was terminated less than one year after becoming eligible for the bonus, he is not entitled to any equity payment and requested that the Court reconsider its denial of summary judgment on Count Five.

Second, with respect to the annual incentive cash bonus at issue in Counts Six and Seven, Accenture presented new factual evidence to show that Mr. Giunta did not meet the eligibility requirements to receive that bonus for the quarters between the end of the 2007 fiscal year and his termination.  Specifically, Accenture claimed that Mr. Giunta "failed to submit his booked sales" by completing a "sales tracking template" before his departure, and that, in not doing so, he "failed to perform under the 2008 Compensation Model."  (Def.'s Br. Supp. Mot. Reconsideration 3-4, 14.)  As a result, Accenture requested that the Court reconsider its earlier opinion and grant summary judgment on the portions of Counts Six and Seven relating to the annual incentive cash bonus.

The Court denied Accenture's Motion for Reconsideration, because it alleged neither that there had been any change in the controlling law since the Court's November 6, 2008 Opinion, nor that it would suffer any manifest injustice if reconsideration were denied.  The Court also found that Accenture failed to demonstrate either the availability of new evidence not previously available, or the need to correct a clear error of law.

### i. Escape Clause in the 2007 and 2008 Compensation Models

The Court held that Accenture's claim that the clause in the 2007 and 2008 Compensation Models allowing the company to modify or abrogate them at any time rendered them non-binding was merely an alternative legal theory that could have been pursued during the prior summary judgment proceedings.  The Court went further to note that even if it were to give

full weight and consideration to this argument, reconsideration would not be warranted because Mr. Giunta's performance on the terms of the 2007 and 2008 Compensation Models rendered irrevocable Accenture's promise to pay Mr. Giunta's specified salary bonuses in exchange for his work.

### ii. New Factual Arguments

The Count found Accenture's two factual arguments similarly unavailing. With respect to the First, alleging that Mr. Giunta accepted equity bonuses subject to the vesting schedule in the RSU Agreement and RSU Essential Grant Terms in 2005 and 2006, Accenture argued that it was the mutual understanding of the parties that the 2007 long-term equity bonus at issue in Count Five was also subject to the three-year vesting schedule. The Court rejected this argument for two reasons. First, it depended on facts that were not "newly discovered," but known to Accenture at the time of the prior summary judgment proceedings. Second, the Court found a genuine material dispute, because Mr. Giunta argued that the prior equity bonuses were a one-time signing bonus given at the time he was hired, and therefore are irrelevant to the 2007 Compensation Model.

With respect to the second factual argument, alleging that Mr. Giunta failed to submit his booked sales by completing a sales tracking template before his departure, Accenture contended that in not doing so, he failed to perform under the 2008 Compensation Model and was therefore not entitled to receive an annual incentive cash bonus for the quarters between the end of the 2007 fiscal year and his termination. The Court also rejected this argument for two reasons. First, the Court found that these facts were not newly discovered. Second, the terms of the 2008 Compensation Model did not speak at all to the method by which sales are tracked, or to any requirement that Mr. Giunta submit a particular type of documentation to Accenture by a given

date.  Rather, the terms merely state that "employees who are terminated by Accenture (other than 'for cause') before the end of the quarter in which an Annual Incentive award is earned are entitled to receive the award earned in each quarter."  (Compl., Ex. B.)

**D.     The Current Motion**

On June 25, 2010, Accenture moved the Court for summary judgment on Counts One, Two, Five, Six, and Seven of the Complaint.  With respect to Counts One and Two, Accenture argues that Mr. Giunta's claims under the ADA and NJLAD should be dismissed because (1) Accenture was unaware that Mr. Giunta was disabled; (2) Mr. Giunta is not disabled under the ADA or NJLAD; and (3) Mr. Giunta's position at Accenture was terminated for a legitimate, non-discriminatory reason.  With respect to Count Five, Accenture sets forth the same arguments as those in its November 21, 2008 Motion for Reconsideration: (1) that Mr. Giunta's 2007 long-term equity bonus was subject to the vesting requirements of the RSU Agreement because Mr. Giunta accepted equity bonuses in 2005 and 2006 with the awareness that these bonuses were subject to the vesting schedules, which, in turn, created an implied in fact contract with respect to Mr. Giunta's 2007 long-term equity bonus; and (2) the promise of a long-term equity bonus in the 2007 Compensation Model was illusory because the language of that Model made payment of the bonus entirely discretionary.  With respect to Counts Six and Seven, Accenture argues that Mr. Giunta cannot state a claim for a violation of good faith and fair dealing or unjust enrichment because he neither accepted nor performed under the 2008 Compensation Model.

## II.  DISCUSSION

Accenture's motion raises the following issues: (1) whether Mr. Giunta's cracked larynx renders him disabled under the NJLAD and ADA; (2) whether jokes and remarks made about Mr. Giunta's condition are sufficient to show that Accenture's company-wide reorganization was

a pretext to discriminate against him; (3) whether Accenture has timely set forth a basis for reconsideration of certain findings in the Court's November 6, 2008 Opinion; and (4) whether Mr. Giunta's failure to execute the 2008 Compensation Model or present evidence of meeting his prorated target sales requirement entitles him to a bonus thereunder.

### A.    Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."[3] Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

---

[3] At this time, Mr. Giunta is proceeding *pro se*.  The Court of Appeals has held that, on summary judgment, "where a plaintiff is a *pro se* litigant, the court has an obligation to construe the complaint liberally." Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009).  However, *pro se* litigants must still set forth facts sufficient to survive summary judgment. Jacobs v. Cumberland

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

**B.     Mr. Giunta's Claims Under the ADA and NJLAD**

Accenture makes three arguments in support of dismissing Mr. Giunta's claims under the ADA and NJLAD.  First, Accenture argues that nobody at the company knew of Mr. Giunta's medical condition at the time he was terminated.  Second, Accenture contends that even if it had been aware of Mr. Giunta's condition, it does not rise to the level of a disability under the ADA or NJLAD.  Third, even if it were aware of Mr. Giunta's condition, and that condition constituted a disability under both statutes, Accenture maintains that Mr. Giunta was terminated as a part of a company-wide reorganization—a legitimate, non-discriminatory reason.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A qualified individual with a disability is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

---

County Dep't of Corrections, No. 09-0133, 2010 WL 5141717, at *3 (D.N.J. Dec. 8, 2010) (citing Haines v. Kearner, 404 U.S. 519, 520-21 (1972).  Mr. Giunta was represented by counsel at earlier stages in this case, including when he filed the Complaint.  Thus, the Court will construe the Complaint in the same manner that it would were Mr. Giunta currently represented by counsel.

Similarly, the NJLAD prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment."  N.J.S.A. § 10:5-4.1.

The familiar analytical framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973) for resolution of suits brought under Title VII guides the resolution of claims brought under both the ADA and NJLAD.  Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir.1995) (ADA); Viscik v. Fowler Equipment Co., 173, N.J. 1, 14 (2002) (NJLAD).  The McDonnell Douglas analysis proceeds in three stages.  As applicable here, Mr. Giunta must first establish a *prima facie* case of discrimination under each statute.  McDonnell Douglas, 411 U.S. at 802.  If he succeeds in establishing a *prima facie* case, the burden shifts to Accenture "to articulate some legitimate, nondiscriminatory reason for" Mr. Giunta's termination.  Id.  If Accenture meets this burden, Mr. Giunta must then prove by a preponderance of the evidence that the legitimate reasons offered by Accenture are merely a pretext for discrimination.  Id. at 804-05.

### i.    *Prima Facie Case Under the ADA*

To establish a *prima facie* case of retaliation under the ADA, Mr. Giunta must show that (1) he is a disabled person within the meaning of the ADA; (2) he was otherwise qualified to perform the essential functions of the position he held; and (3) he suffered an otherwise adverse employment decision as a result of discrimination.  Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998).  In addition, because disabilities are often unknown to an employer, Mr. Giunta "must demonstrate that the defendant employer knew of the disability to state a prima

facie case of unlawful discharge."  <u>Geraci v. Moody Tottrup, Int'l</u>, 82 F.3d 578, 581 (3d Cir. 1996).

 With respect to the first prong, the ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  To be sure, speaking is specifically included in the ADA as a major life activity.  42 U.S.C. § 12102(2)(A).  However, a plaintiff cannot "merely submit evidence of a medical diagnosis of an impairment" to gain disability status under the statute.  <u>Toyota Motor Mfg. v. Williams</u>, 534 U.S. 184, 198 (2002) (overruled on other grounds by the ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 353 (2008)).  The impairment must "substantially limit[]" Mr. Giunta's ability to speak.

 Accenture likens this case to <u>Pritchett v. Ellers</u>, 324 Fed. Appx. 157 (3d Cir. 2009).  In that case, the Court of Appeals held that medical evidence of the plaintiff's "raspy" voice did not qualify as a disability under the ADA, because it did not "substantially limit his major life activity of speaking."  <u>Pritchett</u>, 324 Fed. Appx. At 159-60.  The court found that although a raspy voice may impact the volume of the plaintiff's speech, there was no evidence that he was unable to articulate words or otherwise communicate with others.  <u>Id.</u> at 159.

 The Court finds this reasoning persuasive.  Here, as in <u>Pritchett</u>, Mr. Giunta has not made any showing that his raspy voice and heavy breathing impedes his ability articulate himself or otherwise communicate with others.  Therefore, Mr. Giunta cannot be classified as disabled under the ADA for having a physical impairment that substantially limits a major life activity.

 The only other way that Mr. Giunta can be found disabled under the ADA is by showing that Accenture "regarded [him] as having such an impairment."  42 U.S.C. § 12102(2).  That is,

Accenture must have "mistakenly believed that [Mr. Giunta] ha[d] a physical impairment that substantially limits one or more major life activities or mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities." Wilson v. MVM, Inc., 475 F.3d 166, 179 (3d Cir. 2007) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 487 (1999)).

Here, there is no evidence indicating that Accenture believed Mr. Giunta's raspy voice to substantially limit his ability to speak or any other major life activity. Mr. Giunta maintains that he disclosed his condition to Accenture at the start of his employment, and that he was "at times the center of jokes that were made in his work environment." (Pl. Br. Summ. J. 5.) However, this in no way indicates that Accenture believed Mr. Giunta to have a condition that substantially limited his ability to speak, or other major life activity. To the contrary, Accenture contends that during Mr. Giunta's tenure, he "communicate[d] effectively with other employees and the public in general." (Def.'s Br. Summ. J. 5.) Thus, because Mr. Giunta has failed to show that he is disabled within the meaning of the ADA, he cannot make a *prima facie* case under the statute.

### ii.    *Prima Facie Case Under the NJLAD*

To establish a *prima facie* case of discriminatory discharge under the NJLAD, Mr. Giunta must show "(1) that he was [disabled][4] within the meaning of the law, (2) that he was performing his job at a level that met his employer's legitimate expectations and that the handicap did not unreasonably hinder his job performance, (3) that he nevertheless was fired, and (4) that the employer sought someone to perform the same work after he left." Viscik, 173, N.J. at 14-15.

Thus, the threshold inquiry is whether Mr. Giunta fits the statutory definition of disabled. Id. at 15. Under N.J.S.A. 10:5-5(q), there are two distinct categories of disability: physical and

---

[4] The statute no longer uses the word "handicapped." It was amended in 2003 to substitute the term "disability" for "handicapped."

non-physical.  To prove a physical disability, a plaintiff must show that he or she is "(1) suffering from physical disability, infirmity, malformation or disfigurement (2) which is caused by bodily injury, birth defect or illness including epilepsy."  N.J.S.A. 10:5-5(q).  Physical disabilities include, but are not limited to, "any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device . . . which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  Id.

Notably, the term disability under the NJLAD is far more flexible than under the ADA. Failla v. City of Passaic, 146 F.3d 149, 154 (3d Cir. 1998) (finding a lower standard of disability under the NJLAD than the ADA because the NJLAD does not require showing that a condition results in a substantial limitation of a major life activity).  Indeed, under the NJLAD, a disability need only "prevent[] the normal exercise of any bodily or mental functions" or be proven with expert medical evidence.  N.J.S.A. 10:5-5(q); see also Viscik, 173, N.J. at 17.

Here, Mr. Giunta suffers from a cracked larynx, which causes him to speak in a raspy voice and breathe heavily.  While there is no expert medical evidence in the record to show that his cracked larynx renders him disabled, it is readily apparent that it prevents the normal exercise of his speech.  Therefore, the Mr. Giunta may be found disabled under the statute.

With respect to the second, third, and forth elements of a *prima facie* case under the NJLAD, the parties do not dispute that (1) Mr. Giunta was performing his job at a satisfactory level or that his condition did not unreasonably hinder his job performance; (2) Mr. Giunta was fired; or (3) Accenture transferred Mr. Giunta's accounts to other employees at Accenture.  See

Viscik, 173, N.J. at 14-15.  Therefore, Mr. Giunta has established a *prima facie* discrimination case under the NJLAD.

### iii.       Burden Shifting Under McDonnell Douglas

Under the McDonnell Douglas framework, because Mr. Giunta has established a *prima facie* case under the NJLAD, the burden shifts to Accenture "to articulate some legitimate, nondiscriminatory reason for" Mr. Giunta's termination.  411 U.S. at 802.  Accenture does so by maintaining that Mr. Giunta's termination was part of a "company-wide reorganization that affected 16 other employees."  (Def's. Br. Summ. J. 24.)  Thus, the burden shifts back to Mr. Giunta to prove, by a preponderance of the evidence, that the alleged company-wide reorganization was merely a pretext for discrimination.  Id. at 804-05.

Mr. Giunta alleges that Bruce Dodd made several negative remarks about his voice and felt "as if Bruce Dodd had an agenda" to get him fired.  (Pl.'s Br. Summ. J. 8.)  There is no evidence in the record to support these allegations.  However, even if there were, the allegations are insufficient to show that Accenture's company-wide reorganization was a pretext for discrimination.

Mr. Giunta's personal belief that Bruce Dodd intended to have him fired is insufficient to defeat summary judgment.  See Dellapenna v. Tredyffrin/Easttown Sch. Dist., No. 09-6110, 2011 WL 130156, at *8 (E.D.Pa. Jan. 13, 2011) ("A plaintiff's personal belief that the real reason for the job action was discriminatory animus does not create a genuine issue of material fact" citing Wagoner v. Garland, 987 F.2d 1160, 1164 (5th Cir. 1993)).  Similarly, the alleged remarks about Mr. Giunta's voice are insufficient because "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight."  Pivirotto v. Innovative Sys., 191 F.3d 344, 359 (3d Cir. 1999) (quoting Ezold v. Wolf, Block, Schorr &

Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).  As Mr. Giunta's career counselor, Bruce Dodd

lacked decisionmaking authority over Mr. Giunta's employment status at Accenture.  Therefore,

any comments he may have made toward Mr. Giunta cannot by themselves show that

Accenture's company-wide reorganization was a pretext for discrimination.

## C.     Mr. Giunta's Long-Term Equity Bonus Under the 2007 Compensation Model

Accenture makes two arguments in support of denying Mr. Giunta his 2007 long-term

equity bonus.  First, it argues that Mr. Giunta understood that the bonus was subject to the three-

year vesting schedule laid out in the RSU Agreement because he had accepted equity bonuses in

2005 and 2006 that were subject to the same vesting schedule.  Second, Accenture argues that

the language of the 2007 Compensation Model renders the promise to pay the long-term equity

bonus illusory.[5]  Mr. Giunta counters that his 2005 and 2006 equity bonuses were distinct from

the 2007 equity bonus and subject to different compensation models.

Accenture's arguments are repetitious of those that were considered and explicitly

rejected in the Court's January 23, 2009 opinion denying Accenture's Motion for

Reconsideration.  See (Opinion, 11-13, January 23, 2009, ECF No. 20.)  Therefore, the Court

rejects Accenture's arguments for the reasons set forth in that opinion.[6]  In addition, the Court

---

[5] Accenture attempts to bolster this argument by alleging that "under New York law, the employer has complete discretion over when and if a bonus payment to an employee becomes vested and absolute."  (Def. Br. Summ. J. 29.)  In doing so, it cites to Canet v. Gooch Ware Travelstead, 917 F. Supp. 969 (E.D.N.Y. 1996).  However, Canet stands for no such proposition; rather, it finds that "where contractual provisions assign the employee absolute discretion to grant and pay bonuses, those provisions may be enforced. . . [However], such discretion will not be implied when such language is absent."  Canet, 917 F. Supp. at 985-86.  Here, the terms of the 2007 Compensation Model do not give absolute discretion to Accenture as to the entitlement or payment of any bonuses thereunder.  The Model clearly lays out a particular amount of sales required to receive a particular bonus.

[6] In its current motion papers, Accenture cites to additional evidence to support its claim that Mr. Giunta was aware that the equity bonuses he received in 2005 and 2006 were subject to a three-year vesting schedule.  However, this has no bearing on the Court's reasoning in its January 23,

invites Mr. Giunta to consider moving for summary judgment on Count Five of the Complaint, seeking payment of his 2007 long-term equity bonus.

**D.    Mr. Giunta's Claims for Breach of Good Faith and Fair Dealing and Unjust Enrichment**

Accenture asserts several arguments in support of dismissing Mr. Giunta's claims for breach of good faith and fair dealing and unjust enrichment, two of which allege that the Court erred in its November 6, 2008 Opinion.  Specifically, Accenture argues that the Court erred in finding that (1) Mr. Giunta alleged that he booked or would have booked sufficient sales by the end of the second quarter of 2008 to be eligible for a prorated bonus; and (2) Mr. Giunta would be entitled to a bonus for each quarter of 2008 in which he booked $7.5 million in sales. Accenture maintains (1) that Mr. Giunta instead alleged that he was terminated before he could reach his sales target for the 2008 fiscal year; and (2) Mr. Giunta would have had to book $30 million in sales in order to be eligible for an annual incentive cash bonus under the 2008 Compensation Model.

These arguments are, in effect, an untimely request for reconsideration.  Under Local Civil Rule 7.1(i), except in narrow circumstances not present here, "a motion for reconsideration shall be served and filed within 14 days after the entry of the order or judgment on the original motion by the Judge or Magistrate Judge."  Here, Accenture's arguments come more than one year and seven months after the Court's decision and order on November 6, 2008.  Moreover, there is no reason why Accenture could not have included these arguments in its Motion for Reconsideration on November 21, 2008.

---

2009 Opinion—that it was disputed whether the 2005 and 2006 equity bonuses were of the same type as the 2007 long-term equity bonus and subject to the same terms as those in the 2007 Compensation Model.  (Opinion, 13, January 23, 2009, ECF No. 20.)

Even if these arguments were timely, Accenture fails to allege "(1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995.) Thus, Accenture has failed to allege a proper basis for reconsideration.

Accenture does, however, set forth a critical fact that Mr. Giunta does not dispute: Mr. Giunta refused to execute the 2008 Compensation Model. On that basis, Accenture argues that Mr. Giunta is not entitled to a bonus under that Model because he never accepted its terms. Mr. Giunta alleges that "the Model was convoluted, and he did not want to sign the document until he understood what it said fully." (Pl.'s Br. Summ. J. 7.) Mr. Giunta also notes that he "was later advised by Counsel not to sign the 2008 Compensation Model." (Id.) Therefore, because Mr. Giunta neither executed nor otherwise accepted the terms of the 2008 Compensation Model, he cannot be entitled to a bonus thereunder. See Morton v. Orchard Land Trust, 180 N.J. 118, 129-30 (2004) ("A written contract is formed when there is a 'meeting of the minds' between the parties, evidenced by a written offer and an unconditional, written acceptance.").

Even if the Court were to find that Mr. Giunta had accepted the terms of the 2008 Compensation Model, he has presented no evidence that he performed under it by meeting his prorated sales target. In its November 6, 2008 Opinion, the Court denied summary judgment on the portions of Counts Six and Seven of Mr. Giunta's Complaint relating to the annual incentive cash bonus under the 2008 Compensation Model "in order to allow the parties to undertake discovery and present evidence on the factual question of whether Mr. Giunta met his sales target between the end of 2007 and his termination." (Opinion, 19, November 6, 2008, ECF No. 11.)

Since then, significant discovery has taken place.  Mr. Giunta now alleges that he "was in the process of working on closing $140,000,000.00 worth of sales" before his termination.  (Pl.'s Br. Summ. J. 4.)  He further alleges that "these accounts were in good standing and in a closing direction when they were taken from him."  (Id. 5.)  However, these allegations in no way indicate that Mr. Giunta met his prorated sales target under the 2008 Compensation Model before he was terminated.  Thus, Mr. Giunta is not entitled to payment of the annual incentive cash bonus under that Model.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.  The Court rules as follows:

1.  Summary Judgment is granted on Count One of the Complaint.  Count One is dismissed.

2.  Summary Judgment is granted on Count Two of the Complaint.  Count Two is dismissed.

3.  Summary Judgment is denied on Count Five of the Complaint.

4.  Summary Judgment is granted on Counts Six and Seven of the Complaint relating to the annual incentive cash bonus.  Counts Six and Seven are dismissed.

The Court will enter an order implementing this opinion.


 /s/ Dickinson  R.  Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: January 31, 2011